**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

SADEIK GIBBS,

       *Plaintiff,*

v.

ACTALENT, INC.; and
INVENERGY, LLC

       *Defendants.*

_____/

**CASE NO.:**

**JURY TRIAL DEMANDED**

## <u>COMPLAINT</u>

Plaintiff Sadeik Gibbs files this action against his former employers, Defendants Actalent,, Inc. and Invenergy, LLC for violations of 42 U.S.C. § 1981, Title VII of the Civil Rights Act, and the Missouri Human Rights Act ("**MHRA**") as follows:

## <u>PARTIES</u>

1. Plaintiff is a resident of Berkely County, South Carolina. He is  African American. At all times material, Defendants were Plaintiff's employers.

2. Defendant Actalent is a Maryland company with its principal address in Ann Arundel County, Maryland. Actalent is a global talent and technology company that connects specialized engineering and scientific experts with companies needing staffing, technical services, and strategic guidance construction projects. Actalent has a portfolio of clients across the country, including in this District.  It also has a significant portfolio of employees that it staffs for Invenergy all over the country. Actalent has over 500 employees.

3. Defendant Invenergy is an Illinois corporation with its principal address in Cook County, Illinois. Invenergy is a multinational corporation that develops, builds, owns, and operates

renewable and other clean energy projects, including in this District. Invenergy has over 500 employees.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 for claims arising under 42 U.S.C. § 1981 and Title VII.

5.      This Court has personal jurisdiction over Defendants because Defendants continuously conduct business within this District.

6.      Pursuant to 28 U.S.C. § 1391, venue is proper in this District because Defendants are subject to personal jurisdiction in this District and because the acts occurred in this District.

## GENERAL ALLEGATIONS

7.      Plaintiff began his career as a journeyman electrician in the solar industry. Over the course of a decade, he became a commissioning manager, then an owner-rep site manager with extensive knowledge regarding electrical aspects of construction.

8.      Plaintiff joined Actalent in in July 2022.

9.      At all times, Actalent's Reed Hall ("**Mgr. Hall**") was Plaintiff's recruiting manager.

10.      At all times, Invenergy's hiring manager Geoff Kerr ("**Mgr. Kerr**") had significant control over whether Plaintiff worked for Invenergy and where Plaintiff would work.

### A. *The Hardy Hills Project in Frankfurt, IN*

11.      Invenergy had a solar project in Frankfurt, Indiana called Hardy Hills Solar ("**Hardy Hills**"). The project involved the construction of a utility scale solar plant.

12.      Invenergy hired an Environmental Procurement and Construction ("**EPC**") contractor and then hired Actalent to manage the EPC contractor throughout the project.

13.     In August 2022, Plaintiff was deployed as an assistant site manager for the Hardy Hills project.

14.     As assistant site manager, Plaintiff's duties included the management of EPC contactor.  Plaintiff was second in authority on site after the primary site manager.

15.     The Invenergy Project Manager on the project, Sam Marketing, told Plaintiff that he would work alongside the primary site manager who lacked experience in solar energy.

16.     Plaintiff was told that he was hired as an assistant (and not primary) site manager as Invenergy lacked projects in need of a primary site manager at that time, and that he would have an opportunity to move up once the Hardy Hills projects was complete.

17.     The project site manager at Hardy Hills was Luke Williams ("**Williams**"), who is Caucasian.

18.     Plaintiff introduced himself to Williams upon arriving at Hardy Hills.

19.     Williams then introduced Plaintiff to the EPC contractor for the project, Cupertino Electric ("**Cupertino**"). During that introduction, rather than introduce Plaintiff as the assistant site manager, Williams told Cupertino that Plaintiff was the project's mechanical superintendent (a lower position than assistant site manager).

20.     Plaintiff attempted to correct Williams' statement, but Williams insisted that Plaintiff was the mechanical superintend, undermining Plaintiff's managerial authority on the site.

21.     From that day forward, Williams engaged in discriminatory and unprofessional behavior.

22.     For example, Williams routinely delayed approving Plaintiff's time cards, forcing Plaintiff to beg him for timely approval.

23.     Williams would hold project meetings without alerting Plaintiff.

24. In meetings Plaintiff was informed of, Williams would discredit Plaintiff's contributions and direct profanity towards him. This was done to discourage Plaintiff from attending meetings.

25. But Williams quickly realized that he needed Plaintiff to attend these meetings, as Williams lacked the relevant experience and knowledge pertaining to compliance on solar projects.

26. Williams and other Invenergy representatives mocked African-Americans. For example, Williams would refer to black workers as 'Chicago hoodlums" and stated that Cupertino should "crack the whip" on black employees.

27. This was the highest paying job Plaintiff had ever had. He attempted to brush these comments off and remain professional.

28. Throughout this time, Williams would simultaneously discredit Plaintiff's position and authority around others but seek Plaintiff's assistance for clarity to ensure that the project was running smoothly.

29. During a meeting in Spring 2023, Jeff Perry, the EPC contractor construction manager, became angry when Plaintiff corrected him on a compliance issue.

30. Perry, in front of Williams and other Invenergy leadership, threw an installation resistance tester (known as a 'megger') at Plaintiff. The leads of the megger struck Plaintiff.

31. Williams simply stood up and left the office, showing no interest in addressing the behavior.

32. Plaintiff reported this incident to Mgr. Hall at Actalent. Mgr. Hall told Plaintiff that "everything was handling itself."

33. Plaintiff subsequently discussed the incident with Cupertino's executive team, who admitted to being aware of it.

34.     Perry was allowed to continue working. He eventually (on his own volition) transferred to another job site.

35.     Williams' discriminatory behavior continued to deteriorate towards non-white individuals on the job site.

36.     Cupertino's commission project manager, a Hispanic female, filed a formal complaint about Williams' hostility. Cupertino sent a formal complaint to Invenergy, but nothing came of it.

37.     The result was predictable: Williams was emboldened and bragged that he was "untouchable."

38.     Months later, Invenergy's regional safety manager visited the Hardy Hills site. Williams blatantly disrespected the manager. She reported the incident to the VP of Safety for Invenergy, who conducted an investigation. In the course of that investigation, Plaintiff was interviewed and confirmed the allegations complained of.  Although Invenergy ultimately substantiated the allegations, nothing changed on the job site (i.e., Williams was not disciplined).

39.     Throughout this time, Williams continued to denigrate Plaintiff in front of visitors to the site. Williams would treat Plaintiff as a chauffeur for guests or send him on odd jobs like picking up food. Often, these jobs were fruitless and used simply as a way of bullying Plaintiff. For example, when an Indiana senator was visiting the site, Williams sent Plaintiff to pick up food 30 minutes away. When Plaintiff returned, the senator and other guests were gone. Williams laughed and said that they must not have been hungry.

40.     Williams made numerous discriminatory comments about Plaintiff's hair (which, at the time, Plaintiff wore in braids) in front of others. Plaintiff at first tried to educate Williams on

5

his hair. But it kept being brought up. Plaintiff cut his hair to stop the conversations from continuing. As always, Plaintiff's goal was to remain professional and do his job.

41.     Williams would not relent. Upon learning that Plaintiff's wife was from Africa, Williams made numerous comments about Africans as "savage" and "poor." As with comments about his hair, Plaintiff attempted to educate Williams and redirect the conversation to professional subject matters.

42.     Plaintiff is Muslim. During Ramadan (during which observants fast from sun up to sun down) Plaintiff mentioned for the first time that he was Muslim to Williams, in the hopes that Williams would be aware that he was fasting. Williams' response was to increase Plaintiff's work load during the month, and for the first time made him the only Invenergy representative to inspect everything on the site without assistance from the site team.

43.     All of this wore on Plaintiff, creating stress and frustration that bled into his professional life. Plaintiff's wife went back to South Carolina with her mother and Plaintiff's daughter while Plaintiff continued working long hours on the Hardy Hills site.

44.     Plaintiff put his foot down: He told Willilams that he would no longer tolerate the constant disrespect and discrimination. And for a while, Williams relented.

### B.  Williams Interferes with Plaintiff's Proposed Promotion

45.     As the project wound down, Plaintiff contacted his Mgr. Hall with Actalent, hoping to negotiate a primary site manager position with Invenergy.

46.     Williams learned of Plaintiff's plans.  At the time (May 2024), Williams had been appointed site manager for a new solar project in Warrenton, Missouri, known as the Split Rail Solar project ("**Split Rail**").

47.    Williams reached out to Mgr. Hall and Mgr. Kerr and claimed that Plaintiff was not ready to lead his own project.

48.    Williams left to take over Split Rail, and Plaintiff remained at Hardy Hills to close out the project, working closely with Invenergy's new project manager, Cesar Lovo ("**Lovo**").

49.    Lovo immediately recognized Plaintiff's expertise and offered him a primary site manager position on a new project slated to begin in July 2025.

50.    Learning of this, Williams requested that Plaintiff be assigned to Split Rail as his assistant site manager.

51.     Williams also reached out to Lovo, asking that Plaintiff be sent to the Split Rail project. Lovo resisted, saying that Plaintiff was going to become a site manager.

52.    Lovo then called the Actalent hiring manager to discuss Plaintiff's promotion, only to be told that Plaintiff was not qualified and needed more experience.

53.    Lovo told Plaintiff that he should go to the Split Rail project, but that once the site manager position opened (in June 2025) Plaintiff would be removed from the Split Rail project and given a site manager position.

54.    With no good options, Plaintiff agreed to go to join the Split Rail project in December 2024.

### C. *The Split Rail Project in Warrenton, MO*

55.     The Split Rail project involves the construction of a massive solar plant in Warrenton, Missouri. The multi-year project (with an approximate target completion date of summer 2026) has received over $500 million in investment funds. Its goal ultimately is to produce approximately 300 megawatts of solar energy.

56.    Invenergy is the developer on the Split Rail project.

57.    In May 2024, Actalent and Invenergy executed a contract for Actalent to provide workers to the Split Rail site.

58.    Upon Plaintiff joining the Split Rail project in January 2025, Williams told Plaintiff that he had no intentions of allowing him to leave for a higher position.

59.    Plaintiff recognized, from his experience on the Hardy Hills project, that he could make valuable contributions given Williams' lack of experience with solar projects.

60.    Williams told Plaintiff that it was difficult to find lodging near the project, but that he had utilized his "white privilege" to procure an RV lot for Plaintiff.

61.    It quickly became clear that Williams wanted Plaintiff on the project as a scape goat in case something went wrong. That—as much as Plaintiff's relevant industry knowledge—was Plaintiff's value to Williams.

62.     The EPC contractor on this project was Kiewit Corporation ("**Kiewit**"). As at Hardy Hills, Williams misrepresented Plaintiff's job title (this time referring to him as "his structural superintendent).

63.    Williams also printed and distributed around the job site a Split-Rail chart of command that listed Plaintiff as a "Mechanical/Electrical superintendent" rather than assistant site manager.

64.    During Plaintiff's first month on the site, he attended a manager's meeting. During the meeting, Plaintiff asked about the Kiewet's plans for pre-functional testing. Williams dismissed this question, stating that he "didn't give a f*** about testing."

65.     This public dismissal left Plaintiff embarrassed, but the Kiewit construction manager, Nick Schiengner ("**Kiewit Mgr. Schiengner**"), agreed that Plaintiff's concerns were valid.

66.     Plaintiff made the decision to report any future incidents.

67.     Throughout the month, Plaintiff reported numerous deficiencies around the project to Williams. Plaintiff highlighted that the contractor was neglecting quality assurance and quality control in the rush to meet deadlines. These accurate observations led to confrontational discussions with Willliams, who was both threatened by Plaintiff's findings and fully invested in the contactor's means and methods (despite deviations from contractual obligations). In short: it was clear that Williams was protecting the contactor. Williams refused to escalate any of the issues Plaintiff pointed out.

68.     The result was, again, predictable: lack of quality control became a significant issue at the Split Rail project. And as Plaintiff feared, Williams pointed to *Plaintiff* as the one responsible.

69.     At this same time, Williams repeatedly brought up the promotion that Lovo had offered, suggesting that he (Williams) had control over Plaintiff's career with Invenergy.

### D. February 10, 2025 Incident and Investigation

70.     On February 10, 2025, Plaintiff attempted to organize a quality control meeting between the Invenergy team and the EPC contractor (Kiewit Mgr. Schiengner) after discovering numerous problematic issues.

71.     That morning, Plaintiff arrived on site to find that Williams was already holding a meeting with a Kiewit construction manager named Allen Fuhs ("**Fuhs**"). Plaintiff joined, and things became tense. Plaintiff pointed out numerous areas where the project was not in compliance. Fuhs stormed out of the office.

72. Fuhs, in the presence of numerous Kiewet and Invenergy employees, began cursing at Plaintiff and threatening him with physical violence.  Specifically, Fuhs stated that if Plaintiff ever challenged him again "we will carry you offsite" – a reference to lynching.

73. Plaintiff reported the incident to the Kiewit Mgr. Schiengner, who assured Plaintiff that the matter would be escalated to HR.

74. Kiewit Mgr. Schiengner himself heard Fuhs yelling at Plaintiff.

75. Plaintiff also emailed Williams, the Kiewit site manager, and the Invenergy project manager Matthew Clausen ("**PM Clausen**") detailing the incident.

76. Later that day, Fuhs attended an owner-walk around the site that Plaintiff was also required to attend. This was the first time a construction manager had gone on such a walk with an owner at the Split Rail project.

77. Thereafter, Fuhs began to follow Plaintiff around the jobsite and intimidate him (including berating him in the parking lot).

78. Plaintiff reported this to Williams who laughed him off and stated that he could see the situation from both perspectives.  He suggested that Fuhs would cool off and eventually apologize. Williams then turned up the volume on his computer, making it impossible for Plaintiff to speak over the noise.

79. The same day, Plaintiff filed a complaint with Invenergy, detailing what had occurred.  He provided that complaint to Mgr. Reed with Actalent.

80. The following day (February 11, 2025), Fuhs again began attempting to intimidate Plaintiff by walking back and forth in front of his office window. PM Clausen arrived and immediately went into Williams' office, ignoring Plaintiff. The two departed to a different location on the site without addressing Plaintiff.

81.     Plaintiff realized that his email had done nothing but result in more threatening and retaliatory behavior.

82.     Plaintiff sent a copy of Invenergy's policies governing site behavior to PM Clausen and Willaims and asked for a meeting, pointing out that as a manager, Plaintiff had the ability to order the removal of a contractor (i.e., Fuhs) for inappropriate behavior on the jobsite.

83.     *That* got their attention: PM Clausen and Williams came into Plaintiff's office and began interrogating him, as if Plaintiff was the one who had behaved inappropriately by (a) attempting to ensure site compliance and (b) reporting the construction manager's inappropriate behavior.

84.     PM Clausen informed Plaintiff that Plaintiff had no authority to request anyone's removal from the jobsite and that the policy did not apply to Plaintiff.

85.     It became clear that neither PM Clausen nor Williams intended to do anything about the construction manager's behavior. Another incident, another cover-up.

86.     In an attempt to remove himself from the situation, Plaintiff took PTO earlier than planned.

87.     On February 13, 2025, Plaintiff provided information to Invenergy's safety manager about the incident in connection with an investigation requested by Plaintiff. At that time, Plaintiff was informed that Invenergy hiring manager Mgr. Kerr had been informed of the situation and was angry.

88.     On approximately February 15, 2025, Plaintiff spoke to Mgr. Kerr, who stated that PM Clausen had handled the situation inappropriately and that he (Mgr. Kerr) had chewed out PM Clausen's (which spurred a call from PM Clausen to Plaintiff to apologize). Plaintiff thought things were headed in the right direction.

89.    While on PTO, he received a call from Actalent's hiring manager, who asked for a statement about the job site and stated that Invenergy's site policies *did* apply to Plaintiff.

90.    On or about February 19, 2025, Plaintiff received a call from Mgr. Hall. Plaintiff expressed his frustration at the way that the Invenergy investigation had been handled and a concern for his well-being. Mgr. Hall encouraged Plaintiff to transfer back to Hardy Hills.

91.    Plaintiff was clear: He was not the problem; Plaintiff described Williams' behavior towards African-Americans and women on the site and the dismissal of his complaint about Fuhs.

92.    Requiring Plaintiff to transfer to another job site was simply punishment for reporting inappropriate behavior.

93.    On February 24, 2025, Plaintiff was formally removed from the Split Rail project.

94.    He requested, through Actalent's human resources professional Sinead O'Connor ("**HR O'Connor**"), the ability to be returned to the Split Rail project.

95.    On February 26, 2025, Plaintiff had a phone call with Mgr. Kerr. He was told that the offending employee had been reprimanded and would have to have some sort of training.

96.    Mgr. Kerr stated that there were concerns about Plaintiff returning to the Split Rail site, particularly coming from PM Clausen. Plaintiff made clear that the only thing he had said to PM Clausen was that Plaintiff was not receiving support in light of his complaint. Essentially, Plaintiff made clear that he was being punished for being transparent about not just the February 10th incident, but Williams' behavior in general. Plaintiff also pointed out Williams' history of misconduct, including at the Hardy Hills site.

97.    Mgr. Kerr suggested that more than 20 people were involved in Invenergy's investigation. It appears that nothing was ever provided to Invenergy's human resources department in connection with this 'investigation.'

98.    Plaintiff again reiterated his desire to return to the Split Rail site and that he was not the problem, and that if everyone on-site would be professional, there should be no problem with Plaintiff's return. Both Plaintiff and Mgr. Kerr recognized that PM Clausen had stated that he had no problem with Plaintiff being on the site.

99.    Mgr. Kerr stated he wasn't sure how to move forward. Mgr. Kerr was clear: Williams would not be removed from the project. Mgr. Kerr stated that Plaintiff *could* return to Split Rail. He also brought up a project in Arizona that Plaintiff could go to.

100.    Mgr. Kerr stated that Plaintiff handled himself professionally and that there was zero indication that Plaintiff had created or instigated the issues at the Split Rail site. But he also walked back that he had reprimanded PM Clausen for his handling of the situation.

101.    Plaintiff again pointed out that under Invenergy's rules, Invenergy had the authority to remove individuals from the job site and posed a simple question: If he was believed, why was the offending party not removed from the site?

102.    Plaintiff pointed out that Williams had repeatedly had individuals removed from job sites and that if it had been Williams, and not Plaintiff, who requested someone to be removed from the job site, it would have happened.

103.    Mgr. Kerr told Plaintiff that Fuhs would apologize. But that was all that would be done. Mgr. Kerr gave Plaintiff two options: Contact Actalent's HR or return to work.

104.    Despite having numerous conversations with Actalent's Mgr. Reed about the situation, this was the first time Plaintiff was made aware that he could contact *Actalent's* HR to address his concerns.

   **E.  *Plaintiff's Communications with Actalent Management and Human Resources*.**

13

105.   Plaintiff then spoke with Mgr. Reed about his conversation with Mgr. Kerr. Plaintiff stated that Mgr. Kerr had told him that he could file a complaint through Actalent.

106.   Mgr. Reed immediately and repeatedly attempted to discourage Plaintiff from filing anything with Actalent HR, stating that a complaint would "drag the process out even more" and that "nothing was going to change."

107.   On February 28, 2025, Plaintiff called Actalent's HR. He pointed out that he had been talking to Mgr. Reed about Invenergy's failure to adequately respond to the situation for weeks and that Mgr. Reed had not told him about the Actalent complaint process and had discouraged him from bringing his problems to Actalent HR.

108.   He spoke again with Actalent's HR on March 4—during which he was told that Plaintiff's complaint had been investigated not by Invenergy at all, but by Kiewit. At the time of the call, Actalent's HR had not bothered to speak with anyone from Invenergy.

### F.   *Plaintiff is Not Allowed to Return to the Split Rail Site Because of His Complaint.*

109.   On March 10, 2025, HR O'Connor informed Plaintiff that he would *not* be allowed to rejoin the Split Rail project.

110.   It was clear: Plaintiff was being transferred because he complained.

111.   Also on March 10, 2025, Plaintiff communicated with Mgr. Reed that, while not ideal, he would accept a transfer to Arizona for a project manager opening (the position previously offered by both Mgr. Kerr).

112.   Plaintiff was forced to break his lease in Missouri.

113.   The next day, Mgr. Reed called Plaintiff. He told him, among other things, that Mgr. Kerr had decided to fill the Arizona position with someone else. Mgr. Reed repeatedly told Plaintiff that it was not Actalent's responsibility to choose which project Plaintiff was assigned and that

Plaintiff had a choice: If Plaintiff he wanted to remain working with Invenergy and wanted everything to "be normal" then he needed to be open to going wherever Invenergy (by way of Mgr. Kerr) decided to place him.

114.    Plaintiff pointed out that he still wanted to return to Split Rail and that the client for which the stie was being built had reached out to him and told him that he was needed there.

115.    Mgr. Reed reiterated that if Plaintiff didn't allow himself to be assigned anywhere, he would be given no job at all.

116.    Plaintiff again pointed out that he had been pushed out of Split Rail despite no wrongdoing.

### G.  *Plaintiff Returns to Hardy Hills*.

117.    With no other options, Plaintiff returned to Hardy Hills.

118.    He tried to make it work.

119.    But realizing that he was never going to be treated as his non-African American peers and citing the ongoing environment of discriminatory and retaliatory conduct effectuated by Defendants, Plaintiff emailed his resignation to Mgr. Kerr on May 6, 2025.

## COUNT I – VIOLATION OF § 1981 (RACE DISCRIMINATION)
### (as to Actalent)

120.    Plaintiff repeats and realleges Paragraphs 1-2, 4-35, 38-52, 54-59, and 61-119 as if fully set forth herein.

121.    Plaintiff was discriminated against because of his race.

122.    Plaintiff suffered an adverse employment action when, among other things, Actalent refused to take appropriate action in response to repeated reports of workplace misconduct from Williams and otherwise, discouraged Plaintiff from reporting to human

resources, failed to take appropriate action to curb the misconduct occurring at the Split Rail site, and refused to allow Plaintiff to return to the Split Rail site.

123. But for Plaintiff's race, Actalent would not have engaged in such conduct.

124. By discriminating against Plaintiff because of his race, Actalent denied Plaintiff the same right to enjoy the benefits, privileges, terms, and conditions of contracts as is and was enjoyed by non-black citizens, in violation of the Civil Rights Act of 1866 (42 U.S.C. § 1981).

125. Defendant acted with malice or with reckless indifference to Plaintiff's federally protected rights. Defendant's management knowingly countenanced or approved of the racial discrimination, as exhibited by, among other things, Actalent's failure to take corrective action to curb against those Company employees who harassed and discriminated against Plaintiff.

126. As a direct and proximate result of Actalent's conduct, Plaintiff has suffered and will continue to suffer damages including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

127. Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by 42 U.S.C. § 1981.

### COUNT II – VIOLATION OF § 1981 (RETALIATION)
**(as to Actalent)**

128. Plaintiff repeats and realleges Paragraphs 1-2, 4-35, 38-52, 54-59, and 61-119 as if fully set forth herein.

129. Plaintiff repeatedly complained of the racial discrimination by his supervisor, Williams (and others), the subsequent investigation into same, and Mgr. Reed's handling of the Split Rail situation.

130. Plaintiff's numerous complaints constituted a protected activity.

16

131.    For complaining, Plaintiff suffered various adverse employment actions. For example: He was denied an opportunity for a promotion, denied any choice as to where he was to be placed (including his request to return to the Split Rail project), and the revocation of his work vehicle.

132.    But for Plaintiff's race, Actalent would not have engaged in these adverse employment actions.

133.    By retaliating against Plaintiff because his race and his protected activity, Actalent denied Plaintiff the same right to enjoy the benefits, privileges, terms, and conditions of contracts as is and was enjoyed by non-black citizens, in violation of Plaintiff's rights under the Civil Rights Act of 1866 (42 U.S.C. § 1981).

134.    Actalent acted with malice or with reckless indifference to Plaintiff's federally protected rights. Actalent's management knowingly and directly countenanced or approved of the retaliation against Plaintiff. Indeed, they actively participated in it.

135.    As a direct and proximate result of Actalent's conduct, Plaintiff has suffered and will continue to suffer, damages including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

136.    Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by 42 U.S.C. § 1981.

### COUNT III – VIOLATION OF § 1981 (CONSTRUCTIVE DISCHARGE)
### (as to Actalent)

137.    Plaintiff repeats and realleges Paragraphs 1-2, 4-35, 38-52, 54-59, and 61-119 as if fully set forth herein.

138.   Actalent altered terms of Plaintiff's employment by, among other things, taking away his company vehicle, refusing to allow him to have any say in where he would be placed, and discouraging him from reporting to HR.

139.   It became clear to Plaintiff that the discriminatory working conditions and constant undermining of his position while working would not be stopped.

140.   But for Plaintiff's race, Actalent would have behaved differently.

141.   In response to this, Plaintiff resigned in May 2025.

142.   Plaintiff's working conditions became so intolerable that a reasonable person would have been compelled to resign.

143.   As a result, Plaintiff has been damaged in an amount to be determined at trial.

### COUNT IV – VIOLATION OF TITLE VII (RACE DISCRIMINATION)
**(as to Actalent)**

144.   Plaintiff repeats and realleges Paragraphs 1-2, 4-35, 38-52, 54-59, and 61-119 as if fully set forth herein.

145.   Plaintiff was discriminated against because of his race, a protected class under Title VII.

146.   Plaintiff suffered an adverse employment action when, among other things, Actalent refused to do anything about the repeated reports of workplace misconduct from Williams and otherwise, discouraged Plaintiff from reporting to human resources, failed to do anything to curb the misconduct occurring at the Split Rail site, and refused to allow Plaintiff to return to the Split Rail site.

147.   But for Plaintiff's race, Actalent would not have engaged in such conduct.

148.   By discriminating against Plaintiff because of his race, Actalent violated Title VII.

18

149. Defendant acted with malice or with reckless indifference to Plaintiff's federally protected rights. Defendant's management knowingly countenanced or approved of the racial discrimination, as exhibited by, among other things, Actalent's failure to take corrective action to curb against those Company employees who racially harassed Plaintiff.

150. As a direct and proximate result of Actalent's conduct, Plaintiff has suffered and will continue to suffer damages including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

151. Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by Title VII.

## COUNT V – VIOLATION OF TITLE VII (RETALIATION)
### (as to Actalent)

152. Plaintiff repeats and realleges Paragraphs 1-2, 4-35, 38-52, 54-59, and 61-119 as if fully set forth herein.

153. Plaintiff is African-American, a protected class under Title VII.

154. Plaintiff repeatedly complained of the racial discrimination by his supervisor, Williams (and others), the subsequent investigation into same, and Mgr. Reed's handling of the Split Rail situation.

155. Plaintiff's numerous complaints constituted a protected activity.

156. For complaining, Plaintiff suffered various adverse employment actions. For example: He was denied an opportunity for a promotion, denied any choice as to where he was to be placed (including his request to return to the Split Rail project), and the revocation of his work vehicle.

157. But for Plaintiff's race, Actalent would not have engaged in these adverse employment actions.

19

158.    By retaliating against Plaintiff because his race and his protected activity, Actalent violated Plaintiff's rights under Title VII.

159.    Actalent acted with malice or with reckless indifference to Plaintiff's federally protected rights. Actalent's management knowingly and directly countenanced or approved of the retaliation against Plaintiff. Indeed, they actively participated in it.

160.    As a direct and proximate result of Actalent's conduct, Plaintiff has suffered and will continue to suffer, damages including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

161.    Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by Title VII.

## COUNT VI – VIOLATION OF TITLE VII (CONSTRUCTIVE DISCHARGE)
### (as to Actalent)

162.    Plaintiff repeats and realleges Paragraphs 1-2, 4-35, 38-52, 54-59, and 61-119  as if fully set forth herein.

163.    Actalent altered terms of Plaintiff's employment by, among other things, taking away his company vehicle, refusing to allow him to have any say in where he would be placed, and discouraging him from reporting to HR.

164.    It became clear to Plaintiff that the discriminatory working conditions and constant undermining of his position while working would not be stopped.

165.    But for Plaintiff's race, Actalent would have behaved differently.

166.    In response to this, Plaintiff resigned in May 2025.

167.    Plaintiff's working conditions became so intolerable that a reasonable person would have been compelled to resign.

168.    As a result, Plaintiff has been damaged in an amount to be determined at trial.

**COUNT VII – VIOLATION OF MHRA (RACE DISCRIMINATION)**
**(as to Actalent)**

169.    Plaintiff repeats and realleges Paragraphs 1-2, 4-35, 38-52, 54-59, and 61-119 as if fully set forth herein.

170.    Plaintiff was discriminated against because of his race, a protected class under the MHRA.

171.    Plaintiff suffered an adverse employment action when, among other things, Actalent refused to take appropriate action in response to repeated reports of workplace misconduct from Williams and otherwise, discouraged Plaintiff from reporting to human resources, failed to take appropriate action to curb the misconduct occurring at the Split Rail site, and refused to allow Plaintiff to return to the Split Rail site.

172.    But for Plaintiff's race, Actalent would not have engaged in such conduct.

173.    By discriminating against Plaintiff because of his race, Actalent violated the MHRA.

174.    Defendant acted with malice or with reckless indifference to Plaintiff's rights. Defendant's management knowingly countenanced or approved of the racial discrimination, as exhibited by, among other things, Actalent's failure to take corrective action to curb against those Company employees who racially harassed and discriminated against Plaintiff.

175.    As a direct and proximate result of Actalent's conduct, Plaintiff has suffered and will continue to suffer damages including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

176.    Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by the MHRA

21

## COUNT VIII – VIOLATION OF MHRA (RETALIATION)
### (as to Actalent)

177.    Plaintiff repeats and realleges Paragraphs 1-2, 4-35, 38-52, 54-59, and 61-119 as if fully set forth herein.

178.    Plaintiff is African-American, a protected class under the MHRA.

179.    Plaintiff repeatedly complained of the racial discrimination by his supervisor, Williams (and others), the subsequent investigation into same, and Mgr. Reed's handling of the Split Rail situation.

180.    Plaintiff's numerous complaints constituted a protected activity.

181.    For complaining, Plaintiff suffered various adverse employment actions. For example: He was denied an opportunity for a promotion, denied any choice as to where he was to be placed (including his request to return to the Split Rail project), and the revocation of his work vehicle.

182.    But for Plaintiff's race, Actalent would not have engaged in these adverse employment actions.

183.    By retaliating against Plaintiff because his race and his protected activity, Actalent violated Plaintiff's rights under the MHRA.

184.    Actalent acted with malice or with reckless indifference to Plaintiff's rights. Actalent's management knowingly and directly countenanced or approved of the retaliation against Plaintiff. Indeed, they actively participated in it.

185.    As a direct and proximate result of Actalent's conduct, Plaintiff has suffered and will continue to suffer, damages including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

22

186.    Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by the MHRA.

### COUNT IX – VIOLATION OF MHRA (CONSTRUCTIVE DISCHARGE)
**(as to Actalent)**

187.    Plaintiff repeats and realleges Paragraphs 1-2, 4-35, 38-52, 54-59, and 61-119 as if fully set forth herein.

188.    Actalent altered terms of Plaintiff's employment by, among other things, taking away his company vehicle, refusing to allow him to have any say in where he would be placed, and discouraging him from reporting to HR.

189.    It became clear to Plaintiff that the discriminatory working conditions and constant undermining of his position while working would not be stopped.

190.    But for Plaintiff's race, Actalent would have behaved differently.

191.    In response to this, Plaintiff resigned in May 2025.

192.    Plaintiff's working conditions became so intolerable that a reasonable person would have been compelled to resign.

193.    As a result, Plaintiff has been damaged in an amount to be determined at trial.

### COUNT X – VIOLATION OF § 1981 (RACE DISCRIMINATION)
**(as to Invenergy)**

194.    Plaintiff repeats and realleges Paragraphs 1, 3-31, 33-104, and 109-119 as if fully set forth herein.

195.    Plaintiff was discriminated against because of his race.

196.    Plaintiff suffered an adverse employment action when, among other things, Invenergy refused to take appropriate action in response to  repeated reports of workplace misconduct from Williams and otherwise, failed to adequately investigate his complaints, refused

to allow him to return to the Split Rail site or join the Arizona site (after previously agreeing to do so), failed to apply its own site policies regarding removal of contractors, and to take appropriate action to curb the misconduct occurring at the Split Rail site.

197.    But for Plaintiff's race, Invenergy would not have engaged in such conduct.

198.    By discriminating against Plaintiff because of his race, Invenergy denied Plaintiff the same right to enjoy the benefits, privileges, terms, and conditions of contracts as is and was enjoyed by non-black citizens, in violation of the Civil Rights Act of 1866 (42 U.S.C. § 1981).

199.    Invenergy acted with malice or with reckless indifference to Plaintiff's federally protected rights. Invenergy's management knowingly countenanced or approved of the racial discrimination, as exhibited by, among other things, PM Clausen and Mgr. Kerr's involvement in the investigation into Plaintiff's complaint, Willliams' continuing misconduct, and the sham investigation.

200.    As a direct and proximate result of Actalent's conduct, Plaintiff has suffered and will continue to suffer damages including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

201.    Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by 42 U.S.C. § 1981.

### COUNT XI – VIOLATION OF § 1981 (RETALIATION)
**(as to Invenergy)**

202.    Plaintiff repeats and realleges Paragraphs 1, 3-31, 33-104, and 109-119 as if fully set forth herein.

203.    Plaintiff repeatedly complained, among other things, of the racial discrimination by his supervisor, Williams (and others), the nature of the investigation into his complaints, and the

failure of Invenergy to apply its own policies regarding removal of contractors engaged in inappropriate workplace behavior.

204.    Plaintiff's numerous complaints constituted a protected activity.

205.    For complaining, Plaintiff suffered various adverse employment actions. For example: He was denied an opportunity for a promotion, denied any choice as to where he was to be placed (including his request to return to the Split Rail project), and treated as if he was the one who had behaved inappropriately simply by reporting clear and open misconduct.

206.    But for Plaintiff's race, Invenergy would not have engaged in these adverse employment actions.

207.    By retaliating against Plaintiff because his race and his protected activity, Invenergy denied Plaintiff the same right to enjoy the benefits, privileges, terms, and conditions of contracts as is and was enjoyed by non-black citizens, in violation of Plaintiff's rights under the Civil Rights Act of 1866 (42 U.S.C. § 1981).

208.    Invenergy acted with malice or with reckless indifference to Plaintiff's federally protected rights. Invenergy's management knowingly and directly countenanced or approved of the retaliation against Plaintiff. Indeed, they actively participated in it.

209.    As a direct and proximate result of Invenergy's conduct, Plaintiff has suffered and will continue to suffer, damages including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

210.    Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by 42 U.S.C. § 1981.

## COUNT XII – VIOLATION OF § 1981 (HOSTILE WORK ENVIRONMENT)
### (as to Invenergy)

211. Plaintiff repeats and realleges Paragraphs 1, 3-31, 33-104, and 109-119 as if fully set forth herein.

212. 42 U.S.C. § 1981 prohibited Defendant from discriminating against Plaintiff in the performance, modification, and termination of his employment, as well as the enjoyment of all benefits, privileges, terms, and conditions of his employment.

213. Plaintiff's harassment was allowed because he is a black man. But for that status, he would have been treated differently by Invenergy leading up to and after the reporting of his supervisors and peers' misconduct.

214. Plaintiff did not welcome the offensive acts and statements of his peers and supervisors.

215. Defendant's conduct was severe and pervasive to a degree that it materially altered the terms or conditions of his employment.

216. Among other factors demonstrating that the work environment had become hostile to Plaintiff, the following occurred:

    a. Williams' repeated racially charged comments and efforts to prevent Plaintiff from rising in the ranks;

    b. Multiple physical threats (including the throwing of a 'megger' at Plaintiff's head) at multiple job sites that were perpetrated upon;

    c. The refusal to apply Invenergy policies, even where a complaint was lodged by Plaintiff;

    d. The refusal to conduct a thorough, meaningful investigation into workplace misconduct;

e.  Treating Plaintiff as if he was untrustworthy and overreacting to workplace misconduct.

217.  A reasonable person would have found that the offensive acts and statements materially altered the terms or conditions of Plaintiff's employment—and that Plaintiff believed that such conduct materially altered the terms and conditions of his employment.

218.  Invenergy knew, or in the exercise of reasonable care should have known, about the hostile work environment.

219.  And yet, Invenergy failed to take appropriate remedial action to eliminate the hostile work environment.

220.  As a direct and proximate result of Invenergy's conduct, Plaintiff has suffered and will continue to suffer, damages including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

221.  Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by 42 U.S.C. § 1981.

## COUNT XIII – VIOLATION OF § 1981 (CONSTRUCTIVE DISCHARGE)
### (as to Invenergy)

222.  Plaintiff repeats and realleges Paragraphs 1, 3-31, 33-104, and 109-119 as if fully set forth herein.

223.  Invenergy altered terms of Plaintiff's employment by, among other things, refusing to allow him to have any say in where he would be placed and refusing to apply its own policies pertaining to the removal of contractors engaged in inappropriate behavior.

224.  It became clear to Plaintiff that the discriminatory working conditions and constant undermining of his position while working would not be stopped.

225.  But for Plaintiff's race, Invenergy would have behaved differently.

226. In response to this, Plaintiff resigned in May 2025.

227. Plaintiff's working conditions became so intolerable that a reasonable person would have been compelled to resign.

228. As a result, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT XIV – VIOLATION OF TITLE VII (RACE DISCRIMINATION)
### (as to Invenergy)

229. Plaintiff repeats and realleges Paragraphs 1, 3-31, 33-104, and 109-119 as if fully set forth herein.

230. Plaintiff is African-American, a protected class under Title VII.

231. Plaintiff suffered an adverse employment action when, among other things, Invenergy refused to take appropriate action in response to repeated reports of workplace misconduct by Williams, Fuhs, and otherwise, failed to adequately investigate his complaints, refused to allow him to return to the Split Rail site or join the Arizona site (after previously agreeing to do so), failed to apply its own site policies regarding removal of contractors, and to take appropriate action to curb the misconduct occurring at the Split Rail site.

232. But for Plaintiff's race, Invenergy would not have engaged in such conduct.

233. By discriminating against Plaintiff because of his race, violated Title VII.

234. Invenergy acted with malice or with reckless indifference to Plaintiff's federally protected rights. Invenergy's management knowingly countenanced or approved of the racial discrimination, as exhibited by, among other things, PM Clausen and Mgr. Kerr's involvement in the investigation into Plaintiff's complaint, Willliams' continuing misconduct, and the sham investigation.

235.    As a direct and proximate result of Invenergy's conduct, Plaintiff has suffered and will continue to suffer damages including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

236.    Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by Title VII.

### COUNT XV – VIOLATION OF TITLE VII (RETALIATION)
**(as to Invenergy)**

237.    Plaintiff repeats and realleges Paragraphs 1, 3-31, 33-104, and 109-119 as if fully set forth herein.

238.    Plaintiff repeatedly complained, among other things, of the racial discrimination by his supervisor, Williams (and others), the nature of the investigation into his complaints, and the failure of Invenergy to apply its own policies regarding removal of contractors engaged in inappropriate workplace behavior.

239.    Plaintiff's numerous complaints constituted a protected activity.

240.    For complaining, Plaintiff suffered various adverse employment actions. For example: He was denied an opportunity for a promotion, denied any choice as to where he was to be placed (including his request to return to the Split Rail project), and treated as if he was the one who had behaved inappropriately simply by reporting clear and open misconduct.

241.    But for Plaintiff's race, Invenergy would not have engaged in these adverse employment actions.

242.    By retaliating against Plaintiff because his race and his protected activity, Invenergy violated Title VII.

243. Invenergy acted with malice or with reckless indifference to Plaintiff's federally protected rights. Invenergy's management knowingly and directly countenanced or approved of the retaliation against Plaintiff. Indeed, they actively participated in it.

244. As a direct and proximate result of Invenergy's conduct, Plaintiff has suffered and will continue to suffer, damages including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

245. Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by Title VII.

## COUNT XVI – VIOLATION OF TITLE VII (CONSTRUCTIVE DISCHARGE)
### (as to Invenergy)

246. Plaintiff repeats and realleges Paragraphs 1, 3-31, 33-104, and 109-119 as if fully set forth herein.

247. Invenergy altered terms of Plaintiff's employment by, among other things, refusing to allow him to have any say in where he would be placed and refusing to apply its own policies pertaining to the removal of contractors engaged in inappropriate behavior.

248. It became clear to Plaintiff that nothing would be done about the discriminatory working conditions and constant undermining of his position while working.

249. But for Plaintiff's race, Invenergy would have behaved differently.

250. In response to this, Plaintiff resigned in May 2025.

251. Plaintiff's working conditions became so intolerable that a reasonable person would have been compelled to resign.

252. As a result, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT XVII – VIOLATION OF TITLE VII (HOSTILE WORK ENVIRONMENT)
### (as to Invenergy)

253.   Plaintiff repeats and realleges Paragraphs 1, 3-31, 33-104, and 109-119 as if fully set forth herein.

254.   Title VII prohibited Defendant from discriminating against Plaintiff in the performance, modification, and termination of his employment, as well as the enjoyment of all benefits, privileges, terms, and conditions of his employment on account of his race.

255.   Plaintiff's harassment was allowed because he is a black man. But for that status, he would have been treated differently by Invenergy leading up to and after the reporting of his supervisors' and peers' misconduct.

256.   Plaintiff did not welcome the offensive acts and statements of his peers and supervisors.

257.   Defendant's conduct was severe and pervasive to a degree that it materially altered the terms or conditions of his employment.

258.   Among other factors demonstrating that the work environment had become hostile to Plaintiff, the following occurred:

    a.   Williams' repeated racially charged comments and efforts to prevent Plaintiff from rising in the ranks;

    b.   Multiple physical threats (including the throwing of a 'megger' at Plaintiff's head) at multiple job sites that were perpetrated upon;

    c.   The refusal to apply Invenergy policies, even where a complaint was lodged by Plaintiff; the r

    d.   The refusal to conduct a thorough, meaningful investigation into workplace misconduct;

e. Treating Plaintiff as if he was untrustworthy and overreacting to workplace misconduct.

259. A reasonable person would have found that the offensive acts and statements materially altered the terms or conditions of Plaintiff's employment—and that Plaintiff believed that such conduct materially altered the terms and conditions of his employment.

260. Invenergy knew, or in the exercise of reasonable care should have known, about the hostile work environment.

261. And yet, Invenergy failed to take prompt remedial action to eliminate the hostile work environment.

262. As a direct and proximate result of Invenergy's conduct, Plaintiff has suffered and will continue to suffer, damages including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

263. Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by Title VII

### COUNT XVIII – VIOLATION OF MHRA (RACE DISCRIMINATION)
**(as to Invenergy)**

264. Plaintiff repeats and realleges Paragraphs 1, 3-31, 33-104, and 109-119 as if fully set forth herein.

265. Plaintiff was discriminated against because of his race.

266. Plaintiff suffered an adverse employment action when, among other things, Invenergy refused to take appropriate action in response to the repeated reports of workplace misconduct from Williams and otherwise, failed to adequately investigate his complaints, refused to allow him to return to the Split Rail site or join the Arizona site (after previously agreeing to do

so), failed to apply its own site policies regarding removal of contractors, and to take appropriate action to curb the misconduct occurring at the Split Rail site.

267. But for Plaintiff's race, Invenergy would not have engaged in such conduct.

268. By discriminating against Plaintiff because of his race, Invenergy denied Plaintiff the same right to enjoy the benefits, privileges, terms, and conditions of contracts as is and was enjoyed by non-black citizens, in violation of the MHRA.

269. Invenergy acted with malice or with reckless indifference to Plaintiff's rights. Invenergy's management knowingly countenanced or approved of the racial discrimination, as exhibited by, among other things, PM Clausen and Mgr. Kerr's involvement in the investigation into Plaintiff's complaint, Willliams' continuing misconduct, and the sham investigation.

270. As a direct and proximate result of Invenergy's conduct, Plaintiff has suffered and will continue to suffer damages including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

271. Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by the MHRA.

### COUNT XIX – VIOLATION OF MHRA (HOSTILE WORK ENVIRONMENT)
**(as to Invenergy)**

272. Plaintiff repeats and realleges Paragraphs 1, 3-31, 33-104, and 109-119 as if fully set forth herein.

273. The MHRA prohibits Invenergy from discriminating against Plaintiff in the performance, modification, and termination of his employment, as well as the enjoyment of all benefits, privileges, terms, and conditions of his employment.

274. Plaintiff's harassment was allowed because he is a black man. But for that status, he would have been treated differently by Invenergy leading up to and after the reporting of his supervisors' and peers' misconduct.

275. Plaintiff did not welcome the offensive acts and statements of his peers and supervisors.

276. Defendant's conduct was severe and pervasive to a degree that it materially altered the terms or conditions of his employment.

277. Among other factors demonstrating that the work environment had become hostile to Plaintiff, the following occurred:

    a. Williams' repeated racially charged comments and efforts to prevent Plaintiff from rising in the ranks;

    b. Multiple physical threats (including the throwing of a 'megger' at Plaintiff's head) at multiple job sites that were perpetrated upon;

    c. The refusal to apply Invenergy policies, even where a complaint was lodged by Plaintiff;

    d. The refusal to conduct a thorough, meaningful investigation into workplace misconduct;

    e. Treating Plaintiff as if he was untrustworthy and overreacting to workplace misconduct.

278. A reasonable person would have found that the offensive acts and statements materially altered the terms or conditions of Plaintiff's employment—and that Plaintiff believed that such conduct materially altered the terms and conditions of his employment.

279.    Invenergy knew, or in the exercise of reasonable care should have known, about the hostile work environment.

280.    And yet, Invenergy failed to take prompt remedial action to eliminate the hostile work environment.

281.    As a direct and proximate result of Invenergy's conduct, Plaintiff has suffered and will continue to suffer, damages including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

282.    Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by the MHRA

## COUNT XX – VIOLATION OF MHRA(RETALIATION)
### (as to Invenergy)

283.    Plaintiff repeats and realleges Paragraphs 1, 3-31, 33-104, and 109-119 as if fully set forth herein.

284.    Plaintiff repeatedly complained, among other things, of the racial discrimination by his supervisor Williams (and others), the nature of the investigation into his complaints, and the failure of Invenergy to apply its own policies regarding removal of contractors engaged in inappropriate workplace behavior.

285.    Plaintiff's numerous complaints constituted a protected activity.

286.    For complaining, Plaintiff suffered various adverse employment actions. For example: He was denied an opportunity for a promotion, denied any choice as to where he was to be placed (including his request to return to the Split Rail project), and treated as if he was the one who had behaved inappropriately simply by reporting clear and open misconduct.

287.    But for Plaintiff's race, Invenergy would not have engaged in these adverse employment actions.

35

288. By retaliating against Plaintiff because his race and his protected activity, Invenergy violated the MHRA.

289. Invenergy acted with malice or with reckless indifference to Plaintiff's rights. Invenergy's management knowingly and directly countenanced or approved of the retaliation against Plaintiff. Indeed, they actively participated in it.

290. As a direct and proximate result of Invenergy's conduct, Plaintiff has suffered and will continue to suffer, damages including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

291. Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by the MHRA.

## COUNT XXI – VIOLATION OF MHRA (CONSTRUCTIVE DISCHARGE)
### (as to Invenergy)

292. Plaintiff repeats and realleges Paragraphs 1, 3-31, 33-104, and 109-119 as if fully set forth herein.

293. Invenergy altered terms of Plaintiff's employment by, among other things, refusing to allow him to have any say in where he would be placed, and refusing to apply its own policies pertaining to the removal of contractors engaged in inappropriate behavior.

294. It became clear to Plaintiff that the discriminatory working conditions and constant undermining of his position while working would not be stopped.

295. But for Plaintiff's race, Invenergy would have behaved differently.

296. In response to this, Plaintiff resigned in May 2025.

297. Plaintiff's working conditions became so intolerable that a reasonable person would have been compelled to resign.

298. As a result, Plaintiff has been damaged in an amount to be determined at trial.

## **REQUEST FOR RELIEF**

Plaintiff respectfully requests the Court enter judgment in his favor as follows:

a.  Back and front pay resulting from Defendants' respective violations of 42 U.S.C. § 1981 to the fullest extent permitted by law;

b.  Compensatory damages resulting from Defendants' respective violations of 42 U.S.C. § 1981 to the fullest extent permitted by law;

c.  Punitive damages to punish Defendants' respective violations of 42 U.S.C. § 1981 to the fullest extent permitted by law;

d.  Back and front pay resulting from Defendants' respective violations of Title VII to the fullest extent permitted by law;

e.  Compensatory damages resulting from Defendants' respective violations of Title VII to the fullest extent permitted by law;

f.  Punitive damages to punish Defendants' respective violations of Title VII to the fullest extent permitted by law;

g.  Back and front pay resulting from Defendants' respective violations of the MHRA to the fullest extent permitted by law;

h.  Compensatory damages resulting from Defendants' respective violations of the MHRA to the fullest extent permitted by law;

i.  Punitive damages to punish Defendants' respective violations of the MHRA to the fullest extent permitted by law;

j.  Pre-judgment and post-judgment interest;

k.  An award of costs and reasonable attorneys' fees; and

l.  Such other relief as this Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all claims.

Dated: September 24, 2025                    Respectfully submitted,

By: */s/ Deaken Z. Shuler*
Deaken Z. Shuler
Bar No.: 75316 (MO)
dshuler@pollardllc.com

**Pollard PLLC**
8112 Maryland Ave., Ste. 400
Clayton, MO 63105
Telephone: 954-332-2380
Facsimile: 866-594-5731
*Attorney for Plaintiff*

38